**E-FILED**
Thursday, 26 January, 2012 04:27:20 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# PEORIA DIVISION

| | | |
|---|---|---|
| CATERPILLAR INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-1017 |
| | ) | |
| ESCO CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N and O R D E R

Before the Court is the Motion for Temporary Restraining Order and/or Preliminary Injunction filed by Plaintiff, Caterpillar Inc., on January 12, 2012 (Doc. 5). The Motion is denied insofar as it requests a temporary restraining order, and taken under advisement insofar as it requests a preliminary injunction.

### BACKGROUND

On January 12, 2012, Plaintiff Caterpillar Inc. ("Caterpillar"), a manufacturer of heavy equipment used in construction, mining, and other applications, filed a Verified Complaint (Doc. 1) with this Court. In its Complaint, Caterpillar alleges that ESCO Corporation ("ESCO"), a manufacturer of ground engaging tools capable of being incorporated in products manufactured by Caterpillar, has breached its contract with Caterpillar. Specifically, Caterpillar alleges that ESCO has failed to live up to its obligations under the Master Purchase Agreement ("MPA"), which, according to Caterpillar, requires ESCO "to provide Caterpillar with all of Caterpillar's requirements" for a ground engaging tool system

1

known as the K-Series. (Doc. 1 at 1). Caterpillar maintains that it holds a privileged status with respect to ESCO's production capacity as a result of a provision in the MPA which states that ESCO will give Caterpillar's "Firm Orders" for K-Series products "first priority on ESCO's production capacity." (Doc. 1 at 2). However, Caterpillar does not believe that it has been receiving "first priority" treatment, and that, as a result, Caterpillar's supply of the K-Series product has been significantly disrupted. Caterpillar alleges that by the end of 2011, "ESCO was behind on 2,511 tons" of K-Series product that Caterpillar had ordered. (Doc. 12 at 14).

Also on January 12 Caterpillar filed the present Motion seeking a temporary restraining order and/or a preliminary injunction "in order to protect its supply chain of a component part (the K-Series ground engaging tool) that is critical to its business." (Doc. 5 at 1). According to Caterpillar, if ESCO fails to supply Caterpillar with its K-Series requirements, the consequences would be dire: "Production lines would shut down. Caterpillar would not be able to supply its customers . . . with new machines that dealers in turn sell to end users." (Doc. 5 at 2). Additionally, because the "tips" of the K-Series product wears out with use, Caterpillar claims that "[i]f the supply of K-Series [replacement] parts were cut off, end users around the world would be deprived of the use of their machines, causing sweeping injuries that may lead to litigation against Caterpillar, its dealers, ESCO and others."[1] (*Id.*) Both of these types of harms, Caterpillar alleges, will "damage Caterpillar's reputation, harm its good will[,] and result in lost profits." (*Id.*) Caterpillar

---

[1] Caterpillar estimates that there are over 146,000 Caterpillar machines "in the field" that use the K-Series.

2

maintains that a temporary restraining order is appropriate, because the harm which would be caused is of a type "for which there would be no adequate remedy at law." (*Id.*)

A hearing on the present Motion was held on January 24, 2012, in which both parties were represented by counsel. For the purposes of the present Motion, the Court notes that it will not consider Caterpillar's Reply (Doc. 23) to ESCO's Response, as that document was stricken from the record.

## DISCUSSION

A temporary restraining order ("TRO") is an "emergency remedy," which, generally speaking, is used to "maintain the status quo until a hearing can be held on an application for a preliminary injunction." *Crue v. Aiken*, 137 F. Supp. 2d, 1076, 1082 (C.D. Ill. 2001). A TRO is therefore a form of preliminary relief used "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). In the Seventh Circuit, the standards for a TRO and a preliminary injunction are functionally identical. *Crue*, 137 F. Supp. 2d at 1082-83.

Federal Rule of Civil Procedure 65 provides for the issuance of a TRO with or without notice. Notice was given in this case, and, as mentioned above, a hearing was held. In order for a TRO to issue, a party must make a threshold showing that:

(1) it has some likelihood of success on the merits;

(2) no adequate remedy at law exists; and

(3) it will suffer irreparable harm in the interim period prior to final resolution of its claims if the injunction is not granted.

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Ferrell v. United States Dep't of Housing and Urban Dev.*, 186 F.3d 805, 811 (7th Cir. 1999). Assuming that the moving party establishes these factors, the Court then "balances the harms" to both of the parties that would result from the TRO using a "sliding scale" analysis, while additionally considering the effect that granting the injunction will have on the public. *Girl Scouts*, 549 F.3d at 1086. If the plaintiff has made a stronger showing that he will be successful on the merits, the balance of harms need weigh less heavily in his favor. *Roland Machinery Co. v. Dresser Indust., Inc.*, 749 F.2d 360, 387 (7th Cir. 1984). However, because the granting of an injunction is extraordinary relief, a plaintiff is required to make a "clear showing" of the above factors. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1. *Likelihood of Success on the Merits*

Section 7(d) of the MPA states the following:

> At all times, Caterpillar shall have first priority on ESCO's production capacity to the extent of the Firm Orders for Product placed by Caterpillar, and ESCO shall devote sufficient first priority production capacity to assure that Caterpillar's Firm Orders for Product are promptly and regularly filled. . . .

MPA § 7(d). The parties dispute the meaning of "first priority." ESCO argues that the phrase merely requires ESCO to give Caterpillar's Firm Orders some sort of special preferential treatment over the orders of other clients. Caterpillar, on the

4

other hand, maintains that "first priority on production capacity" means just that: if there are two orders, one Caterpillar Firm Order and one order from another client, waiting to be filled, Caterpillar's Firm Order goes first—every time.

During the January 24 hearing, ESCO's counsel skillfully argued that the "first priority" provision is ambiguous, and that the language following the comma ("and ESCO shall devote sufficient first priority production capacity to assure that Caterpillar's Firm Orders for Product are promptly and regularly filled") shows that the parties could not have contemplated the type of arrangement for which Caterpillar argues. However, the Court finds that the meaning of the "first priority" provision is clear: Caterpillar's Firm Orders go first, every time. Because the Court finds the language of this provision so clear on its face, the Court presumes that this is the contract for which the parties bargained.

It is undisputed that a number of Firm Orders are currently backlogged. Because § 7(d) is unambiguous, the Court finds that there is a substantial likelihood of success on the merits as to these Firm Orders. Additionally, according to Caterpillar, there are currently Firm Orders for January and February 2012. Assuming these orders are Firm Orders, § 7(d) would apply, and these Firm Orders would be entitled to priority treatment and, if necessary, "bumped to the front of the line" ahead of all of the orders of other clients.

Additionally, it is undisputed that there are outstanding "short dated orders" that ESCO has yet to fill. These orders are subject to § 7(c) of the MPA, which states:

> in the regular ordering process, it will be a common occurrence that a significant number of orders will be short dated (Caterpillar orders contemplated to be filled in less than sixty (60) days. ESCO will use its best efforts to fill and ship any short dated orders by the required delivery date, and ESCO agrees to maintain processes with contingency plans in order to be able to do so.

MPA § 7(c). Thus far, ESCO has presented no evidence suggesting that it maintained processes with contingency plans that would help to ensure that it shipped short dated orders by the required delivery dates. As such, the Court finds that, based on the record before it, there is a significant chance that Caterpillar will be successful in its claim that ESCO breached the MPA as to short dated orders. Since short dated orders are not the equivalent of Firm Orders, priority treatment under § 7(d) was not intended, and these orders should be filled by their due dates or no later than sixty days from the date and placement of the order.

There is another important contractual provision that the Court finds to be unambiguous: § 7(g). That section states the following:

> Any Purchase Order, Purchase Order Release issued to ESCO by Caterpillar for Product shall be binding upon ESCO whether or not ESCO expressly accepts the same by executing and returning an order acknowledgment, unless ESCO notifies Caterpillar of ESCO's rejection thereof within five (5) days after receipt.

MPA § 7(g). Again, whether this provision is the product of good negotiation or bad drafting is irrelevant to the Court, because the meaning is clear: ESCO has the ability to reject "any Purchase Order, Purchase Order Release." Because ESCO has this right of rejection, the contract is not a true requirements contract. ESCO has already accepted the orders that are backlogged, as well as any Firm Orders or short dated orders place with ESCO on or before January 1, 2012. However, going

forward, if ESCO chooses to reject Caterpillar's orders, they would have the right to do so under the Court's current interpretation of the MPA.

The Court suspects, then, that Caterpillar will be successful in obtaining *some* of the relief it requests (based on the above interpretations of the MPA), but likely not all of it.

### 2. *No Adequate Remedy At Law*

Were the K-Series available on the open market from other suppliers, Caterpillar could simply cover: buy the product from someone else (presumably at a higher price), then sue ESCO for damages. But this is not the case. Caterpillar has limited license rights to produce the K-Series products itself, and it does not have capacity to produce anywhere near the volume of products it requires.[2] For all practical purposes, Caterpillar must purchase the K-Series from ESCO. Section 2-716 of the Illinois UCC states that "specific performance may be ordered where the goods are unique or in other proper circumstances." 810 ILCS 5/2-716. The K-Series is a unique good that Caterpillar cannot sufficiently produce itself, and the Court finds that under these circumstances requiring specific performance would be warranted.

### 3. *Irreparable Harm*

Patrick F. Kozlowski's declaration (Doc. 12, Ex. A) and the Verified Complaint (Doc. 1) (verified by Patrick F. Kozlowski) do present some showing of harm. In his sworn declaration, Kozlowski asserted that Caterpillar can no longer

---

[2] Nor is Caterpillar under any contractual obligation to produce the parts it requires.

7

fill orders for replacement parts, that there have been disruptions in assembly lines, and that "Caterpillar's stock of some of the highest use K-Series component parts has been exhausted and even more are just two weeks away from running out." (Doc. 1, Ex. A). The reputational harm to Caterpillar and the independent dealers of Caterpillar products and the attendant loss of goodwill that would result from an inability to produce essential replacement parts and new equipment orders incorporating the K-Series would undoubtedly be significant.

The Court does note, however, that the evidence Caterpillar presented is somewhat sparse. At the January 24 hearing, Caterpillar's counsel admitted that Caterpillar tried to "gild the lily" by adding another affidavit in Caterpillar's inappropriately filed Reply, which the Court subsequently struck. Caterpillar maintained, however, that the Verified Complaint and Kozlowski's eight-paragraph affidavit, standing alone, satisfied its burden for the purposes of the TRO. ESCO's counsel focused heavily on Caterpillar's lack of evidence at the hearing, arguing that Caterpillar's showing is simply "not the stuff of which TROs are made."

But even assuming that the Verified Complaint and Kozlowski's declaration present facts that would be substantively sufficient to pass the "irreparable harm" threshold, the Court believes that it must nonetheless find that Caterpillar has not met its burden as to this element. That is because the Court does not know who Patrick F. Kozlowski is. In his declaration, Kozlowski maintains that he is "a Caterpillar Inc. employee." (Doc. 12, Ex. A). At the January 24 hearing, Kozlowski was referred to as "our Caterpillar representative." Kozlowski is not mentioned at

all in the Verified Complaint, though he did sign it. (Doc. 1 at 15). There is nothing in the record—including oral argument—showing his position within Caterpillar, his job responsibilities, or any other basis for the Court to infer that he has personal knowledge of the matters contained in his declaration.

Rule 602 of the Federal Rule of Evidence provides that "[a] witness may not testify in a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Without any evidence of what Mr. Kozlowski does at Caterpillar—what his job duties are, or, at the very least, what his actual title is—the Court cannot assume that he has personal knowledge of the facts to which he attests. It therefore follows that the Court cannot rely in good conscience on Kozlowski's representations in his declaration or the Verified Complaint.

Caterpillar has consequently failed to make a sufficient showing of irreparable harm. As a result, the Court need not "balances the harms" to both of the parties that would result from the imposition of a TRO, nor must the Court consider the effect that granting the injunction will have on the public.

## Conclusion

For the foregoing reasons, Caterpillar Inc.'s Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 5) is denied insofar as it requests a temporary restraining order, and taken under advisement insofar as it requests a preliminary injunction. Defendant has represented that it will provide its Answer to Plaintiff's Complaint by January 30, 2012.

9

IT IS THEREFORE ORDERED:

1. Caterpillar Inc.'s Motion for Temporary Restraining Order is DENIED, and its Motion for Preliminary Injunction is TAKEN UNDER ADVISEMENT.

2. A status conference (by telephone) is set for January 30, 2012, at 10:00 a.m. to determine the need for discovery and establishment of the preliminary injunction hearing date. Pursuant to Rule 65(a)(2), the trial on the merits will be advanced and consolidated with the hearing on the Motion.

Entered this <u>26th</u> day of January, 2012.

                                                           s/ Joe B. McDade
                                                    JOE BILLY MCDADE
                                    United States Senior District Judge